Case 21-00111   Doc 60   Filed 07/18/22   Entered 07/18/22 12:11:05   Desc Main
Document     Page 1 of 18

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 21bk07972 |
| Channel Clarity Holdings LLC, | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | Honorable LaShonda A. Hunt |
| | ) | |
| | ) | |
| Channel Clarity Holdings LLC, | ) | Adv. Proc. No. 21ap00111 |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| Kasey Klaas, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

This matter is before the Court for ruling after a trial on the remaining count of this

adversary complaint where plaintiff/debtor Channel Clarity Holdings LLC ("CCH") seeks to

subordinate the unsecured claim of defendant/creditor Kasey Klaas ("Klaas") under 11 U.S.C. §

510(b).  For the reasons that follow, the Court finds that CCH did not meet its burden of

establishing that Klaas' claim arose from the purchase or sale of securities of the debtor or an

affiliate of the debtor.  Accordingly, judgment will be entered in favor of Klaas.[1]

**PROCEDURAL HISTORY**

CCH sought bankruptcy relief under subchapter V of chapter 11 after Klaas initiated

collections on a $1.83 million judgment awarded to him in state court.    In both this two-count

adversary complaint and its objection to Klaas' proof of claim in the bankruptcy case, CCH

---

[1]   In light of the Court's ruling that Klaas' claim is not subject to mandatory subordination, the following
orders will be entered in CCH's bankruptcy case, 21bk07972, to resolve the pending related matters: Debtor's
Objection to Klaas Claim No. 10.1 (Bankr. Dkt. #57) will be overruled and Debtor's Motion to Disallow Klaas Vote
(Bankr. Dkt. ##140, 194) will be denied as moot.

sought to avoid Klaas' lien and to subordinate Klaas' claim.  CCH moved for summary judgment on both counts, and prevailed on lien avoidance.  However, the Court found genuine issues of material fact remained as to the circumstances underlying the transactions between Klaas, CCH, and others that resulted in the redemption of Klaas' membership interest.  *See Order Granting in Part and Denying in Part Plaintiff's Motion for Summary Judgment*, Adv. Dkt. #31.  The Court presumes familiarity with that decision.

Accordingly, the subordination count proceeded to trial at a combined hearing on CCH's adversary complaint/claim objection/motion to disallow Klaas' vote and confirmation of CCH's proposed plan, all held on May 10-12 and 24, 2022 over Zoom.  *See Notice of Combined Confirmation and Evidentiary Hearing*,  Adv. Dkt. #35; Bankr. Dkt. #174; *Order Denying in Part and Continuing in Part CCH Motion to Disallow Vote*, Bankr. Dkt. #194.  Multiple witnesses offered testimony about these pending matters: Klaas; CCH CEO, Brock Flagstad ("Flagstad"); CCH current/former employees, Jack Murphy ("Murphy"), Eric Olsen, and Jason Hayes; CCH shareholder James Streibich; and subchapter V trustee Matthew Brash.  In lieu of oral closing arguments at the end of the combined trial/confirmation hearing, the Court agreed to allow the parties to submit written post-trial briefs.

During the post-trial Zoom hearing on May 26, 2022, the Court was clear that with respect to subordination, *only* the named parties—CCH as plaintiff and Klaas as defendant— were entitled to be heard on the issue.[2]  Counsel for Flagstad was present and did not object or ask questions.  To ensure there would be no confusion, the Court entered an order reiterating the

---

[2] Counsel for Klaas raised a continuing objection to Flagstad's participation in the combined hearing, which the Court overruled on the ground that under 11 U.S.C. § 1128, Flagstad as a creditor in the case and the representative of CCH, was a party-in-interest with a right to be heard on plan confirmation.  But Flagstad is not a named party to this adversary proceeding, nor has he ever sought leave of court to intervene in this action under Fed. R. Civ. P. 24, made applicable by Fed. R. Bankr. P. 7024.  Furthermore, Flagstad did not file his own objection to Klaas' claim in the bankruptcy case.  CCH has retained experienced bankruptcy counsel to represent the interests of the debtor in *CCH's* adversary case and *CCH's* claim objection.

same limitation.  *See Order Concluding Trial and Scheduling Post-Trial Briefing* (Adv. Dkt. #48).  Notwithstanding that directive, Flagstad filed his own post-trial brief in support of CCH's requests for confirmation *and* subordination in violation of this Court's order.  *See Brock Flagstad's Post-Trial Memorandum in Support of Confirmation of Debtor's Second Amended Chapter 11 Plan of Reorganization and Subordination of Claim of Kasey Klaas*, Adv. Dkt. #51.  Consequently, Flagstad's unauthorized brief will be stricken from this record and none of his arguments pertaining to subordination will be considered by the Court.

The Court has reviewed the record and written submissions of CCH and Klaas.  This decision constitutes the Court's findings of fact and conclusions of law under Fed. R. Civ. P. 52(a), made applicable by Fed. R. Bankr. P. 7052.

## **BACKGROUND**

The relevant and mostly undisputed facts are drawn from the pretrial stipulations, witness testimony, and admitted exhibits.   The Court also takes judicial notice of the dockets in the bankruptcy case, adversary proceeding, and any other related litigation.  *See Inskeep v. Grosso (In re Fin. Partners)*, 116 B.R. 629, 635 (Bankr. N.D. Ill. 1989).

Klaas and Flagstad are entrepreneurs with substantial experience working in the digital marketing and data collection space.  They were business partners for awhile but now each operates his own separate ventures.  Their relationship began at Channel Clarity, Inc. ("CCI"), which was founded by Flagstad in 2005 with the original purpose of helping automotive dealerships list their vehicles in online marketplaces.  Sometime that same year, Klaas joined CCI for what would be the first of two stints with the company.  Klaas eventually left for another role elsewhere but returned to CCI in 2009.  By then, CCI's primary business model was focused on selling debt settlement leads.  Klaas anticipated helping establish new lines of business.

3

As the business relationship between Flagstad and Klaas flourished, they created an entity known as FK Holdings LLC ("FK Holdings").  Initially, the purpose was to hold a boat that Flagstad and Klaas wanted to purchase together.  Eventually, FK Holdings held the equity in multiple ventures of Flagstad and Klaas, with each of them individually owning an equal 50% interest.[3]  Klaas owned shares in FK Holdings both individually and as Trustee of Roth IRA of Kasey Klaas ("Klaas IRA") (collectively, the "Klaas Shares.")

In 2011, a disagreement arose between Klaas and Flagstad about the future direction of their business enterprises.  Klaas also claimed that he was entitled to 30 percent of the equity in CCI.  Flagstad, who was and still is the sole owner of CCI, disagreed.  In December 2011, FK Holdings was involuntarily dissolved by the Illinois Secretary of State.  To resolve their ongoing dispute and avoid costly litigation, Klaas and Flagstad eventually agreed to end their partnership and have Klaas sell his interest in FK Holdings to Flagstad.  To effectuate the deal, on September 28, 2012, the parties entered into a series of related documents that were all purportedly executed simultaneously.

FK Holdings, CCH, Klaas, and the Klaas IRA entered into a Unit Redemption Agreement ("Redemption Agreement") for Klaas and the Klaas IRA to sell to FK Holdings all of the Klaas Shares for a purchase price of $1,196,663.[4]  Exhibit A to the Redemption Agreement contains Definitions that govern these transactions.  Exhibit B to the Redemption Agreement is a Subordinated Promissory Note ("Note").  In the Note between CCH and Klaas, CCH as Borrower promised to pay Klaas as Lender the principal amount of $1,070,224 by September 2015 pursuant to the Redemption Agreement, and a third document, a Settlement and Mutual

---

[3] Klaas testified that those holdings included InParallel LLC, New Management LLC, and ROI Positive Media, LLC.

[4] The Klaas Shares are defined as "Purchased Units" in the Redemption Agreement.

4

Release Agreement ("Settlement Agreement"), which was Exhibit C to the Redemption Agreement.  The Settlement Agreement made between FK Holdings, CCI, CCH, Flagstad, and Murphy ("Company Parties") and Klaas and Klaas IRA ("Klaas Parties") provided that Klaas and the Company Parties were settling, resolving, and releasing all claims against each other arising from their previous business dealings.  The Settlement Agreement stated that as consideration for the settlement, the "Company," defined as CCH in the Redemption Agreement, "has agreed to purchase the Klaas Parties' respective interests in the Company."

The Redemption Agreement referred to the three documents collectively as the "Transaction Documents."  The Redemption Agreement also indicated that simultaneously with the purchase of Klaas' membership interest, "the assets and liabilities of FK [Holdings] and [CCI] are being transferred into [CCH] for agreed upon consideration."

One week prior to executing the Transaction Documents, Flagstad had formed CCH as a Delaware limited liability company and entered into a Limited Liability Company Agreement.[5] On September 28, 2012, the same day the deal closed with the Klaas Parties and others, CCH entered into an Amended and Restated Limited Liability Company Agreement.  Additionally, but in a separate transaction as contemplated by the Redemption Agreement, Flagstad, in his capacity as sole shareholder of FK Holdings and CCI, caused each entity to enter into a Contribution, Assignment and Assumption Agreement ("FK-CCI Contribution Agreement") that contributed all FK Holdings assets to CCI, and as consideration, CCI assumed all of FK Holdings' liabilities.  Similarly, Flagstad caused CCI and CCH to enter into a Contribution, Assignment and Assumption Agreement ("CCI-CCH Contribution Agreement"), which provided

---

[5] The initial agreement was not introduced into the record.

that in exchange for 95.87% of CCH's Common Units, CCH agreed to assume and accept all of

CCI's assets and liabilities.[6]

Nearly seven years later, Klaas successfully sued CCH in state court to enforce the Note,

obtaining the judgment for $1,835,953.23 that is the basis for his claim in CCH's bankruptcy

case.  CCH contends that by executing the FK-CCI and CCI-CCH Contribution Agreements at

the same time as the Transaction Documents, it was essentially agreeing to pay Klaas for the

redemption of his equity in CCH as successor-in-interest to all assets and liabilities of CCI and

FK Holdings.  Klaas, on the other hand, maintains that he held an equity interest in FK Holdings

only, which was neither the debtor nor an affiliate of the debtor.[7]

Jurisdiction over this matter is proper under 11 U.S.C. § 1334 and Internal Operating

Procedure 15(a) of the United States District Court for the Northern District of Illinois.  This is a

core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), and (O).

## DISCUSSION

Section 510(b) of the Bankruptcy Code provides that:

> a claim arising from rescission of a purchase or sale of a security of the debtor or
> of an affiliate of the debtor, for damages arising from the purchase or sale of such
> a security . . . shall be subordinated to all claims or interests that are senior to or
> equal the claim or interest represented by such security. . . .

11 U.S.C. § 510(b) (2018).  A creditor's proof of claim typically constitutes "prima facie

evidence of the validity and amount of the claim."  Fed. R. Bankr. P. 3001(f).  As such, to

successfully subordinate a claim, the burden falls upon the debtor to establish that the claim

---

[6]  Schedule A of the CCH Amended LLC Agreement reflects that CCI holds 6,942 common units of CCH's total 7,400 common units.

[7] Klaas also asserts that his claim arises from a state court lawsuit concerning the breach of a promissory note that CCH gave to Klaas, not the purchase or sale of a security.  But that argument was already considered and rejected in the Court's January 13, 2022, Order Granting in Part and Denying in Part Plaintiff's Motion for Summary Judgment.  (*See* Adv. Dkt. #32, pp. 7–8). Klaas has not pointed to additional evidence adduced at trial that would change the Court's prior ruling.  As such, it is law of the case that controls.

arose consistent with one of the circumstances listed under section 510(b). *See SemiCrude, L.P.*, 436 B.R. 317,319–20 (Bankr. D. Del. 2010).

Klaas timely asserted a general unsecured claim against CCH for the state court judgment amount, which CCH maintains should be subordinated to all other general unsecured creditors because it arises from an agreement to purchase Klaas' security interest in debtor CCH. In essence, CCH contends that because FK Holdings transferred its assets and liabilities to CCI, and then CCI transferred its assets and liabilities to CCH, the transaction with Klaas was actually a redemption of equity in CCH. This scenario, CCH argues, is identical to *In re marchFirst, Inc.*, where the bankruptcy court subordinated a claim against the post-merger debtor even though the stock purchase deal was done with the pre-merger entity. 431 B.R. 436, 442 (Bankr. N.D. Ill. 2010). However, the evidence in the record does not support CCH's version of events here and *In re marchFirst* is easily distinguishable.

## I.

In determining whether a claim should be subordinated under section 510(b), many courts have found the phrase "arising from" ambiguous. Thus, they have turned to the legislative history and an instructive law review article written by John J. Slain and Homer Kripke to make sense of the statute. *See In re Seaquest Diving, LP*, 579 F.3d 411, 420 (5th Cir. 2009). Drafters relied on the Slain and Kripke article that emphasized the distinction between what investors expect out of a business enterprise and what creditors expect out of that same enterprise. *See In re Betacom of Phoenix, Inc.*, 240 F.3d 823, 829 (9th Cir. 2001) (citing H. Rep. 95–595, at 195 (1977)). Those "dissimilar expectations of investors and creditors" support the rationale for mandatory subordination. *See Betacom*, 240 F.3d at 829. Specifically, creditors only anticipate the repayment of a fixed debt whereas investors anticipate "a potentially unlimited share of

7

future profits." *Seaquest Diving, LP*, 579 F.3d at 420. But in exchange for these potentially unlimited profits, investors risk the loss of their capital investment "which provides an equity cushion for the repayment of creditors' claim." *Id.* Subordination thus should work to implement these expectations in the bankruptcy context.

With those principles in mind and construing section 510(b) broadly, courts have concluded that for a claim to "arise from" the purchase or sale of a security, "there must be some nexus or causal relationship between the claim and the sale of the security." *In re Telegroup, Inc.*, 281 F.3d 133, 138 (3d Cir. 2002). The *Telegroup* court and later courts relied on a "but-for" test to determine whether the appropriate causal relationship exists. *In re RTI Holding Co. LLC*, Case No. 20-12456, 2021 WL 3409802, at *3 (Bankr. D. Del. Aug. 4, 2021). The basic application of this test is whether the claimant's claim would exist but-for the purchase of equity in the debtor. *Telegroup, Inc.*, 281 F.3d at 143.

Applying that standard, it is clear that subordination is not appropriate here because CCH failed to prove that Klaas' claim is for damages arising from the purchase or sale of a security *of the debtor or an affiliate of the debtor*. The evidence, in particular the Transaction Documents—the Redemption Agreement, the Note, and the Settlement Agreement— not only established that Klaas' claim arose from the redemption of his equity in FK Holdings but also that CCH cannot show a causal connection between the redemption of Klaas' equity in FK Holdings and a redemption of equity in CCH as the debtor. Ultimately Klaas is a creditor entitled to be treated on the same level as other unsecured creditors in CCH's bankruptcy case, not subordinated with investors.

8

## II.

To fully comprehend the nature of the deal to redeem the Klaas Shares in FK Holdings requires a complete review of the Transaction Documents.[8]   The starting point for interpreting contract terms is "the plain language of the contract itself." *Wilson v. Career Educ. Corp.*, 729 F.3d 665, 672 (7th Cir. 2013) (Darrow. J, concurring).   When parties enter into instruments that are executed and applicable simultaneously, those instruments must be construed together. *Berkeley Props., Inc. v. Balcor Pension Invs., II*, 227 Ill.App.3d 992, 169 Ill. Dec. 576, 579, 592 N.E.2d 63, 66 (1992).   *See also Magnuson v. Schaider*, 183 Ill.App.3d 344, 131 Ill. Dec. 753, 762, 538 N.E.2d 1309, 1318 (1989) (in a sale of a tavern where parties simultaneously executed four documents, the court found that those documents must be read as essentially one contract).

Reading everything together as a whole, the Court concludes that the intention behind the transaction was solely to purchase Klaas' equity in FK Holdings.   Flagstad, who controlled half of FK Holdings and all of CCI, basically bought out Klaas' existing membership interest in their business ventures in exchange for a broad release of all claims Klaas was raising.   CCH simply funded the deal.

When interpreting contractual agreements, courts are "instructed to give effect to *all* the relevant contractual language to resolve the question of the parties' intent." *Hagene v. Derek Polling Const.*, 388 Ill.App.3d 380, 385, 327 Ill.Dec. 883, 902 N.E.2d 1269, 1274 (2009) (emphasis in original).   This includes the recitals to the agreement. *Id.*   Even though recitals "are not [an] operational part of [the] contract between the parties, they reflect the intent of the

---

[8] The Redemption Agreement provides at clause 8.2(a) that it "shall be governed by and construed in accordance with the laws of the State of Illinois."   The Court therefore relies upon Illinois case law to assist in its analysis of the Transaction Documents.

9

parties and influence the way the parties constructed the contract." *First Bank & Tr. Co. of Ill. v. Village of Orland Hills*, 388 Ill.App.3d 35, 48, 272 Ill.Dec. 485, 787 N.E.2d 300, 311 (2003).

The recitals in the Redemption Agreement support the finding that the parties intended to redeem all of the Klaas Parties' interests in FK Holdings only. The first recital states that "(i) Klaas owns the following Class A Membership Units and Class B Membership Units in FK [Holdings]: 50 Class A Membership Units, 3000 Class B-1 Membership Units and 1500 B-2 Membership Units and (ii) Klaas IRA owns 1500 Class B-2 Membership Units in FK [Holdings]." Those are the "Klaas Shares" or "Purchased Units." The second recital provides that "Sellers desire to sell to FK [Holdings], and FK [Holdings] desires to purchase from Sellers all of the Units owned by the Sellers . . . on the terms and conditions set forth in this agreement." "Sellers" are the Klaas Parties. Then clause 2.1 of the Redemption Agreement reiterates that on the closing date, the Klaas Parties "shall sell and transfer to FK [Holdings], and FK [Holdings] shall purchase and redeem from [them] the Purchased Units." In other words, according to the Redemption Agreement, Klaas was selling all Klaas Shares in FK Holdings back to FK Holdings. Since Klaas held a 50% interest in FK Holdings and Flagstad held the other 50%, the purchase of his membership interest essentially left Flagstad as the sole shareholder in control of FK Holdings.

CCH disputes this fact and points to the third recital of the Settlement Agreement stating that "the Company has agreed to purchase the Klaas Parties' respective interests in the Company." Although the term "Company" was not defined in the Settlement Agreement, according to the opening paragraph of the document, those terms "shall have the meanings ascribed to them in that certain Unit Redemption Agreement dated as of the date hereof among the Klaas Parties and FK." And the Redemption Agreement defines the "Company" as CCH.

10

On its face, then, it appears that the Settlement Agreement indicates CCH is redeeming its own interest and therefore section 510(b) is implicated.  CCH hangs its hat entirely on that language.

But there is reliable evidence in the record showing that is simply a misstatement. Indeed, Klaas provided external evidence and testimony at trial of the error.  Klaas Exhibit 15 contained an email from CCH's counsel that was sent on September 25, 2012 and included final drafts of the Transaction Documents and a redline of preceding drafts. The redline of the Redemption Agreement indicates that in a prior draft, FK Holdings was defined as "the Company," but in the final draft, the parties decided to change the definition of "the Company" from FK Holdings to CCH.  Counsel for CCH explained in the email that the changes were intended to account for the fact that "FK Holdings is essentially going away once this deal is consummated."  Basically, the deal documents were revised to ensure that the Settlement Agreement released the appropriate party—CCH—from future claims, and the Note obligated the appropriate party—CCH—for future payments.  There is no indication that the parties intended by these changes to grant Klaas previously nonexistent rights and interests in CCH.[9]

The evidence supports a finding that the parties inadvertently missed some necessary changes in the Redemption Agreement and the Settlement Agreement.  But those scrivener's errors do not override all the contrary evidence in the entirety of the Transaction Documents that the only interest in any of the entities that Klaas owned and could redeem was solely in FK Holdings.

---

[9]  Another example of this error can be found in clause 2.2 of the Redemption Agreement which states: "the Purchase Price will be paid to Klaas and Klaas IRA in proportion to their respective ownership of the Membership Units in the Company."  CCH did not produce the September 21, 2012 LLC Agreement to show that Klaas owned membership units in CCH on September 28, 2012 when the Transaction Documents were executed.  The Court suspects that the original LLC Agreement would reflect exactly what Flagstad, Klaas and every other witness who was asked about this issue has stated, namely that Klaas never held any equity interest in CCI or CCH.

11

## III.

Next, CCH turns to the FK-CCI Contribution Agreement and the CCI-CCH Contribution Agreement and contends that those documents reflect that Klaas was effectively redeeming an interest in CCH rather than FK Holdings. Specifically, CCH asserts that the FK-CCI Contribution Agreement and the CCI-CCH Contribution Agreement obligated CCH under the Note to pay Klaas for the redemption of his equity in CCH as the successor-in-interest to all assets and liabilities of CCI and FK Holdings. CCH's theory here is that because FK Holdings merged into CCI, and then CCI contributed all of its assets and liabilities to CCH, Klaas was actually redeeming equity in CCH. However, that conclusion is not supported by either the facts or the law.

First, CCH's focus on the contribution agreements as the cause of its liability for the Note is misplaced. The Note itself expressly states in the first sentence that CCH is the entity responsible for making payments to Klaas: "[f]or value received, Channel Clarity Holdings, LLC . . . hereby promises to pay to Kasey Klaas." From the outset, CCH agreed to be the borrower on the Note for which Klaas was the lender. Given that FK Holdings had already been administratively dissolved and was apparently going away as part of this deal, it makes sense that some other viable entity would need to guarantee payment to Klaas in order to get the stock purchase and settlement agreement done.

Furthermore, Klaas had already sold his interest in FK Holdings and released whatever equity he claimed to be entitled to in CCI by the time these contribution agreements were being executed. The recitals to the FK-CCI Contribution Agreement confirm that "Flagstad is the sole owner of the membership interest in FK [Holdings] and the sole shareholder of [CCI]." At that point, the Transaction Documents had already been effectuated and Klaas' equity interest in FK

12

Holdings had been extinguished.  The Court acknowledges the Redemption Agreement anticipated all of these transactions—the share purchase, resulting note, settlement, and contribution assignments—occurring simultaneously but that is obviously not how this deal unfolded.  As a 50% shareholder of FK Holdings, Flagstad likely would not have had authority on his own to execute the contribution agreement with CCI.[10]  In sum, the Klaas Shares no longer existed by the time Flagstad executed the FK-CCI and CCI-CCH Contribution Agreements.

Last, CCH contends that these contribution agreements effectuated a merger as in *In re marchFirst* but CCH is mistaken.  In that case, the creditor had entered into a stock purchase agreement with a predecessor entity that merged with another company that subsequently filed for bankruptcy.  431 B.R. at 440.  The creditor asserted a claim for damages against the successor debtor that was ultimately subordinated.  Here, in contrast, as already explained, CCH failed to establish that a purchase of its own stock or the stock of an affiliate was implicated for purposes of section 510(b).  More importantly, CCH has not offered a shred of evidence or legal authority to support its throwaway contention that FK Holdings merged into CCI or CCH.

The FK-CCI Contribution Agreement did not result in a statutory merger such that Klaas' equity in FK Holdings became equity in CCI.  It is axiomatic that because "corporations are creations of the General Assembly . . .any consolidation, purchase or merger by which [the corporation] acquires the franchise of another corporation must also have statutory authority." *Chicago Title & Tr. Co. v. Doyle*, 259 Ill. 489, 492, 102 N.E. 790 (1913).  Accordingly, the

---

[10]  Exhibit A to the Redemption Agreement references an FK Operating Agreement, "effective as of January 1, 2011 among the Company [meaning FK Holdings since CCH did not exist in 2011], the Sellers [Klaas Parties] and Flagstad, as members and Flagstad and Klaas as Managers."  This document was not introduced into the record to show that Flagstad was authorized to act unilaterally.

13

Court looks to Illinois statutes to determine whether the FK-CCI Contribution Agreement caused a merger of the two entities.

Illinois corporate law outlines the procedures required for a transaction to qualify as a merger or consolidation of a corporation. *See* 805 ILL. COMP. STAT. ANN. 5/11.05 (West 2022). Among these requirements is that the two corporations propose a plan of merger. *Id.* The shareholders of the merging entities vote, if entitled, on the plan of merger or consolidation. 805 ILL. STAT. COMP. ANN. 5/11.15 (West 2022); 805 ILL. STAT. COMP. ANN. 5/11.20 (West 2022). Once approved, the merging corporations each execute articles of merger or consolidation and file a duplicate of those records with the Secretary of State. 805 ILL. STAT. COMP. ANN. 5/11.25 (West 2022). The merger becomes effective on the date the Secretary of State files the articles of merger or consolidation. 805 ILL. STAT. COMP. ANN. 5/11.40 (West 2022).

At the trial, CCH did not present evidence of compliance with any of those statutory requirements or other steps necessary to effectuate a merger.[11] The FK-CCI Contribution Agreement, standing alone, did not effectuate a statutory merger between FK Holdings and CCI.

CCH also did not prove that the FK-CCI Contribution Agreement resulted in a de facto merger. "The de facto merger doctrine applies where statutory merger formalities are not followed, but where, for reasons of equity, the acquiring corporation is treated as if they had been followed." *Gray v. Loyola Univ. of Chi.*, 652 N.E.2d 1306, 1310, 274 Ill.App.3d 256, 265, 210 Ill.Dec. 330 (1995). Courts find de facto mergers when the following criteria are present:

> "(1) the seller corporation ceases ordinary business operations, liquidates and dissolves as soon as legally and practically possible; (2) the purchasing corporation assumes those liabilities and obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the seller; (3) There is a continuity of shareholders which results from the purchasing

---

[11] Again, the Transaction Documents reference an FK Operating Agreement, but it was not introduced at trial. As such, the Court has no clue what approvals, if any, were required for FK Holdings to be authorized to proceed with a merger.

14

corporation paying for the acquired assets with shares of its own stock, this stock ultimately coming to be held by the shareholders of the seller corporation so that they become a constituent part of the purchasing corporation; and (4) There is a continuation of the enterprise of the seller corporation, so that there is a continuity of management, personnel, physical location, assets and general business operations.

*Fenderson v. Athey Products Corp., Kolman Div.*, 581 N.E.2d 288, 290, 220 Ill.App.3d 832, 835, 163 Ill.Dec. 337 (1991). Notably, when conducting this analysis, courts tend to conclude that continuity of ownership is the most important factor. *Id.* at 291.

The transfer of assets and liabilities and dissolution of FK Holdings are not enough to satisfy the test. There has been no showing of continuity of shareholders following the FK-CCI Contribution Agreement, as Flagstad and Klaas both held equity in FK Holdings while Flagstad remained the sole shareholder of CCI. Stock ownership was not the result of a provision of the FK-CCI Contribution Agreement, though. Instead, Flagstad already had control of CCI's shares and the assets of FK Holdings were merely transferred to CCI in exchange for the assumption of CCI's liabilities. *See Manh Hung Nguyen v. Johnson Mach. & Press Corp.*, 433 N.E.2d 1104, 1106, 104 Ill.App.3d 1141, 1143, 60 Ill.Dec. 866 (1982) (finding no continuity of shareholders where a corporation's assets were not exchanged for stock or other securities). Flagstad and CCH certainly knew how to exchange shares for assets, as evidenced by the CCI-CCH Contribution Agreement, executed simultaneously with the FK-CCI Contribution Agreement. Because no equity was exchanged for the assets of FK Holdings and only one shareholder had an interest in the resulting company, the continuity of shareholders prong is not satisfied.

In addition, CCH has not shown that CCI was a mere continuation of FK Holdings. The latter held Flagstad and Klaas' business ventures, some of which may have continued. The record is silent on that point. Consequently, the Court concludes that there is no evidence of a merger, either statutory or de facto, such that Klaas' equity interest in FK Holdings became an

15

equity interest in CCI.  And because Klaas never had any equity in CCI, the Court need not consider whether a merger occurred between CCI and CCH.

**IV.**

Finally, CCH contends that Klaas is judicially estopped from claiming that he did not have an interest in CCI because of a statement/stipulation that Klaas' counsel made during a hearing in their prior state court litigation about the Note: "[t]here is no dispute that the note [underlying the Klaas Claim] was part of a settlement of Mr. Klaas' claim against Channel Clarity regarding ownership."  That stipulation is not an admission.  Nor is Klaas' testimony suggesting that the September 2012 deal encompassed his interest in CCI.

A claim of entitlement is not the equivalent of an established right.  And Klaas has been relatively consistent throughout these proceedings in making that distinction.  Although Klaas was adamant in his belief that he was entitled to 30% equity in CCI, Flagstad strongly opposed that idea.[12]  As with most settlements, they chose to resolve their differences without any concessions or admissions by either party.  CCH has not identified any statements in the Transaction Documents to show that the deal involved anything other than a termination of the business relationship between Flagstad and Klaas through a redemption of Klaas' equity interest in FK Holdings and resolution of their dispute through a broad release of existing and theoretical claims.

---

[12] Flagstad's trial testimony reflects his continuing disagreement with the notion that Klaas or anyone else ever had an equity interest in CCI.  When asked whether he remained the sole owner of CCI from the inception to its present time, Flagstad stated: "Based upon the way that the – yes, the answer is yes."  Confirmation Hr'g Tr. p. 541, ll. 18-19.  While Flagstad suggested that FK Holdings also held or sought to hold Klaas' purported equity in CCI (Hearing Tr. pg. 545, ll. 2-13), his testimony in the state court trial immediately preceding the bankruptcy filing contradicts that statement: "FK Holdings was an entity that Kasey and I owned 50/50.  All new business ventures that we embarked on at that time outside of Channel Clarity, because Kasey did not own Channel Clarity, were theoretically owned by FK, though undocumented." (Hearing Tr. pg. 259, ll. 5-10)

16

Simply put, nothing in this record supports a finding that Klaas was redeeming an *actual* interest in CCI or CCH.  Because Klaas' proof of claim is ultimately based on CCH's breach of the Note to purchase his shares in FK Holdings only, which is not the debtor or an affiliate of the debtor, section 510(b) does not apply.

## V.

Moreover, subordinating Klaas' claim would run counter to the policies underlying section 510(b).  Subordination "serves to effectuate one of the general principles of corporate and bankruptcy law: that creditors are entitled to be paid ahead of shareholders in the distribution of corporate assets."  *Racusin v. Am. Wagering, Inc. (In re Am. Wagering, Inc.)*, 493 F.3d 1067, 1071 (9th Cir. 2007).

Klaas never expected to share in the risks and rewards of CCH.  He is not mentioned anywhere in CCH's Amended LLC Agreement, let alone identified as an investor.   To the contrary, he brokered a deal to redeem his interest in FK Holdings and become a creditor of CCH who is owed money based on the Note.   That the redemption deal involved CCH does not automatically mandate subordination.  FK Holdings was a distinct entity from CCH.  Klaas was never in the position of a shareholder in CCH.  He is simply not the kind of claimant that section 510(b) seeks to prevent from collecting ahead of general unsecured creditors.  Therefore, Klaas' claim will not be subordinated.

## CONCLUSION

For the foregoing reasons, judgment will be entered in favor of defendant/creditor Kasey Klaas on Count II of the adversary complaint and against plaintiff/debtor Channel Clarity Holdings LLC.  A separate judgment will be entered as required under Federal Rule of

17

Bankruptcy Procedure 9021.  Furthermore, the unauthorized brief filed by nonparty Brock

Flagstad (Adv. Dkt. #51) will be stricken from the record.


Dated:  July 18, 2022

ENTER:

Honorable LaShonda A. Hunt
United States Bankruptcy Judge